Steve D. Larson, OSB No. 863540
slarson@stollberne.com
Elizabeth K. Bailey, OSB No. 172956
ebailey@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

Robert J. Nelson (to be admitted pro hac vice)
rnelson@lchb.com
Fabrice N. Vincent (to be admitted pro hac vice)
fvincent@lchb.com
Jacob H. Polin (to be admitted pro hac vice)
jpolin@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

Alexandra L. Foote (to be admitted pro hac vice)
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (786) 408-8083

*Attorneys for Plaintiffs*
Nari Suda LLC and Pakin Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NARI SUDA LLC, a Delaware corporation, dba Nari; and Pakin Corporation, a California corporation, dba Kin Khao, on behalf themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>OREGON MUTUAL INSURANCE COMPANY, an Oregon corporation,<br><br>        Defendant. | Case No.  3:20-cv-01476<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**1. BREACH OF CONTRACT,**<br>**2. BREACH OF COVENANT OF GOOD FAIR DEALING,**<br>**3. UNFAIR BUSINESS PRACTICES,**<br>**4. DECLARATORY RELIEF** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     PARTIES .....................................................................................................3

        A.      Representative Plaintiffs ..................................................................3

        B.      Defendant .........................................................................................3

III.    JURISDICTION AND VENUE .....................................................................3

IV.     FACTUAL BACKGROUND ........................................................................4

        A.      The Rapid Spread of Coronavirus....................................................4

        B.      Governments Around the Country Order Everyone to Shelter in Place.................6

        C.      The Restaurants Close.....................................................................11

        D.      The Losses From These Closures Are Covered Business Interruptions................12

        E.      Defendant's Denial of Plaintiffs' Insurance Claim..........................16

V.      CLASS ACTION ALLEGATIONS ............................................................18

VI.     CLAIMS FOR RELIEF ..............................................................................21

FIRST CLAIM FOR RELIEF BREACH OF CONTRACT ........................................21

SECOND CLAIM FOR RELIEF BREACH OF COVENANT OF GOOD FAITH AND
        FAIR DEALING..................................................................................23

THIRD CLAIM FOR RELIEF UNFAIR BUSINESS PRACTICES UNDER BUS. &
        PROF. CODE § 17200, *ET SEQ*.....................................................24

FOURTH CLAIM FOR RELIEF DECLARATORY RELIEF ...................................27

VII.    PRAYER FOR RELIEF ..............................................................................28

VIII.   JURY TRIAL DEMAND ...........................................................................29

Plaintiffs Nari Suda LLC, a Delaware corporation, dba Nari ("Nari"), and Pakin Corporation, a California corporation, dba Kin Khao ("Kin Khao") (collectively "Plaintiffs" or "the Restaurants") file this Complaint Against Oregon Mutual Insurance Company, an Oregon corporation, ("Oregon Mutual" or "Defendant"), on behalf of themselves and all others similarly situated, and allege as follows:

## I.    **INTRODUCTION**

1.    Kin Khao and Nari are celebrated San Francisco restaurants that infuse traditional Thai recipes with modern California techniques and ingredients. They were created by Pim Techamuanvivit.  Ms. Techamuanvivit started her first restaurant, Kin Khao, in San Francisco in 2014.  Kin Khao was awarded a Michelin star in 2015, after only one year of operation.  Nari opened more recently, in 2019, and has been described by the San Francisco Chronicle as "San Francisco's most exciting new restaurant."[1]  Esquire Magazine named Nari among the Best New Restaurants in America.[2]  Earlier this year, Ms. Techamuanvivit was nominated for the prestigious James Beard Award for Best Chef in California, for which she was finalist before the awards were cancelled.[3]  This was her second nomination.  She was also nominated for the same James Beard award in 2019.

2.    About five months ago, Kin Khao and Nari were both forced to shut down.  This closure was ordered by the state and local governments who required the Restaurants, their workers, and their customers to "shelter in place" and abide by strict "social distancing" guidelines.  As with most restaurants, neither of the Restaurants had significant cash reserves and

[1] Soleil Ho, "Bold and fearless, Nari is SF's most exciting new restaurant," *San Francisco Chronicle* (Nov. 15, 2019), available at https://www.sfchronicle.com/restaurants/article/Bold-and-fearless-Nari-is-SF-s-most-exciting-14835452.php#photo-18046312 (last visited May 3, 2020).

[2] Jeff Gordinier, "Esquire's Best New Restaurants in America, 2019," Esquire (Nov. 13, 2019), https://www.esquire.com/food-drink/restaurants/a29728503/best-new-restaurants-in-america-2019/ (last visited May 3, 2020).

[3] Becky Duffett, "Announcing the SF Bay Area's 2020 James Beard Awards Finalists," SF Eater, May 4, 2020, https://sf.eater.com/2020/5/4/21246865/james-beard-awards-2020-bay-area-sanfrancisco-finalists-chefs-restaurants (last visited June 16, 2020).

each quickly depleted what funds they had during the period of reduced business that preceded the shutdown.  The closure—and accompanying loss of income—forced them to immediately begin furloughing employees.  Most of them were later laid off.  Notwithstanding this, the Restaurants have continued to retain the employees they can.  But, with mounting expenses, their ability to continue doing so is limited.  Absent a reversal of the order or financial support, the Restaurants and may have to consider even more drastic measures.

3.      To protect their business (and employees) from having to make such terrible choices in situations like this one, the Restaurants purchased insurance from Defendant that included coverage for business interruption.  Indeed, when they began furloughing employees, the Restaurants anticipated conducting re-hirings once Defendant began providing insurance coverage for their business shutdowns.  The Restaurants' policies expressly provide coverage for "Lost Business Income" and the consequences of actions by "Civil Authority."  Accordingly, the restaurants understandably believed that their policies would help protect their businesses in the unlikely event that the government ever ordered them to stop or severely restrict operations in connection with a pandemic or any other Covered Cause of Loss.

4.      Notwithstanding, and contrary to, the coverage provisions in their policies with Defendant, and the obligations Defendant undertook in exchange for the Restaurants' insurance premium payments, when Plaintiffs submitted claims with  Defendant for coverage, Defendant summarily denied both Restaurants' claims.  These denials were part of a premeditated strategy by Defendant to deny all claims related to the "shelter in place" orders and COVID-19.  They were untethered to the facts of the claims, which Defendant did not adequately investigate, or the specific coverage provided by the Restaurants' policies, and were therefore illegal.

5.      The other members of the proposed Class and California Subclass (each defined below) were subject to the same conduct by Defendant.  As a result of Defendant's conduct alleged herein, the Restaurants and other Class and California Subclass members suffered damages and, absent appropriate injunctive and declaratory relief, will continued to be harmed by Defendant's misconduct.

II.    **PARTIES**

A.    **Representative Plaintiffs**

6.      Plaintiff Nari Suda LLC ("Nari") is a Delaware corporation that does business as and owns Nari, a restaurant located in San Francisco, California.

7.      Plaintiff Pakin Corporation ("Kin Khao") is a California corporation that does business as and owns Kin Khao, a restaurant in San Francisco, California.

B.    **Defendant**

8.      Defendant Oregon Mutual Insurance Company is an Oregon corporation with its headquarters and principal place of business in McMinnville, Oregon.

III.   **JURISDICTION AND VENUE**

9.      This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class and California Subclass is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class and California Subclass each consist of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

10.      This Court has personal jurisdiction over Defendant because Defendant is registered to do business in Oregon, has sufficient minimum contacts in Oregon, and otherwise intentionally avails itself of the markets within Oregon through its business activities, such that the exercise of jurisdiction by this Court is proper.  Moreover, the claims of Plaintiffs and all of the California Subclass members in this case arise out of and directly relate to Defendant's contacts with Oregon.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant has marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this District.

## IV.    FACTUAL BACKGROUND

### A.    The Rapid Spread of Coronavirus

12.    COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19").  The first instances of the disease spreading to humans were diagnosed in or around December 2019.

13.    According to the World Health Organization ("WHO"): "People can catch COVID19 from others who have the virus.  The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales.  These droplets land on objects and surfaces around the person.  Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth.  People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets."[4]

14.    This is problematic, *inter alia*, because a human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[5]

15.    According to a recent report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[6]  The more people in a conversation, the more droplets are dispersed.

16.    Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

---

[4] *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 21, 2020).

[5] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

[6] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

17.    These droplets can spread Coronavirus when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[7]

18.    Droplets containing Coronavirus infect a variety of surfaces and objects for a period of a hours, days, or weeks, if not longer.  After inspecting a cruise ship inhabited by passengers carrying the Coronavirus, the CDC reported that Coronavirus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[8]

19.    Recent scientific evidence shows that Coronavirus can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[9]

20.    Testing involving similar viruses in the Coronavirus family shows that Coronavirus can likely survive on ceramics, silicon rubber, or paper for up to five days if not longer.[10]

21.    When public areas containing such surfaces may have been exposed to Coronavirus, a number of countries including China, Italy, France, and Spain have required such areas to be fumigated prior to re-opening.[11]

---

[7] *See, e.g.*, CDC website, "How COVID-19 Spreads*,"* 2020, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[8] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

[9] *See* Neeltje van Doremalen, et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited April 21, 2020); Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited April 21, 2020).

[10] *See* Guenter Kampf, et al., "Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents," 104 Journal of Hospital Infection 246 (Feb. 6, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132493/pdf/main.pdf (last visited Apr. 21, 2020).

[11] *See* Mike Bird, et al., "China Is Open for Business, but the Postcoronavirus Reboot Looks Slow and Rocky," *The Wall Street Journal* (March 26, 2020), *available at*

*Footnote continued on next page*

22.     This Coronavirus has spread throughout California and the United States.

**B.      Governments Around the Country Order Everyone to Shelter in Place**

23.     As the virus spread in California, state and local officials began discussing wide scale business closures.

24.     On March 13, 2020 President Trump declared the COVID-19 outbreak a national emergency.

25.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19. This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.

26.     Following this advice, and recognizing that there had been numerous confirmed cases of COVID-19 in their jurisdictions, many state government administrations across the nation recognized the need to take steps to protect their residents from the spread of COVID-19. As a result, many governmental administrations entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

---

*Footnote continued from previous page*
www.wsj.com/articles/china-is-open-for-business-but-the-post-coronavirus-reboot-looks-slow-and-rocky-11585232600 (last visited April 22, 2020); Jason Horowitz, "In Italy, Going Back to Work May Depend on Having the Right Antibodies," *The New York Times* (April 4, 2020), *available at* www.nytimes.com/2020/04/04/world/europe/italy-coronavirus-antibodies.html (last visited April 22, 2020); Sarah Elzas, "French Teachers Push Back against Reopening Schools in May," *RFI* (released online Apr. 14, 2020), *available at* www.rfi.fr/en/france/20200414-french-teachers-push-back-against-reopening-schools-in-may (last visited April 22, 2020); Claudia Nuñez, "On the Front Line of the Coronavirus Threat in Spain, Tractors Scatter the Streets with Hope," *Los Angeles Times* (March 27, 2020), *available at* www.latimes.com/world-nation/story/2020-03-27/on-the-front-line-of-the-pandemic-tractors-scatter-the-streets-with-hope (last visited April 22, 2020).

27.     To help create a framework for the implementation of such policies in California, on March 12, 2020, Governor Newsom issued Executive Order N-25-20 ("March 12 Executive Order"), ordering that: "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19" (¶ 1).  This Order took effect on March 12, 2020, and has remained continuously in effect through the date of this Complaint.

28.     On March 16, 2020, the San Francisco Department of Public Health ("SFDPH") issued Order of the Health Officer No. C19-07 ("March 16 Order").  Ex. 1.  The March 16 Order states: "Restaurants and cafes—regardless of their seating capacity—that serve food are *ordered closed* except solely for takeout and delivery service."  *Id.* at 2.[12]  It also "requires all individuals anywhere in San Francisco to shelter in place—that is, stay at home—except for certain essential activities and work to provide essential business."  *Id.* at 1.  This includes refraining from "[a]ll travel" and "[a]ll public and private gatherings of any number of people occurring outside a single household" or "outside the home."  *Id.* at 1 &  ¶¶ 4, 5.  As an exception to this prohibition, the March 16 Order permits travel and gathering that is necessary to operate "Essential Business" (*Id.* ¶¶ 5, 10.d), which the Order defines to include "[r]estaurants and other facilities that prepare and serve food, but only for delivery or carry out" (¶ 10.f.xiii).  Thus the order commands that "All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses."  *Id.* ¶ 2.  Even when leaving the home is permissible, strict social distancing guidelines must be observed.  The order provides that "[v]iolation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both" (*Id.* at 1), and "requests that the Sheriff and the Chief of Police in the County ensure compliance with and enforce this Order," since "violation of any provision of this Order constitutes an imminent threat and creates an immediate menace to public health (*Id.* ¶ 11).  The other Bay Area counties issued similar orders.

---

[12] This and other citations to page numbers (rather than paragraph numbers) from government orders in this complaint, refer to the summaries preceding the numbered paragraphs.

29.     On March 19, 2020, the State of California issued an Order of the State Public Health Officer, which set baseline statewide restrictions on non-essential business activities effective until further notice.  On that same date, California Governor Newsom issued Executive Order N-33- 20, expressly requiring California residents to follow the March 19 Order of the State Public Health Officer, and incorporating by reference California Government Code 8665. That order provides that "[a]ny person . . . who refuses or willfully neglects to obey any lawful order . . . issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such fine and imprisonment" (Cal. Gov. Code § 8665).  The March 19 Order of the State Public Health Officer and Executive Order N-33-20 (collectively, the "Statewide Shelter Orders") took immediate effect on March 19, 2020, and both have remained continuously in effect through the date of this Complaint.

30.     On March 31, 2020, the SFDPH issued Order of the Health Office No. C19-07b ("March 31 Order"), which "supersedes" and "clarifies, strengthens, and extends certain terms of the Prior [SF] Shelter Order to increase social distancing and reduce person-to-person contact to further slow transmission of [COVID-19]."  Ex. 2 ¶ 1.  As it concerns restaurants, the terms of the Prior SF Shelter Order and the March 31 Order are substantially similar, with the March 31 Order stating that "[r]estaurants, cafes, coffee shops, and other facilities that serve food— regardless of their seating capacity—must remain closed except solely for takeout and delivery service" (*Id.* at 2), and continuing to define restaurants as Essential Businesses "only for delivery or carry out" (¶ 13.f.xvii).  Like its predecessor, the March 31 Order also limits the movement and gatherings of individuals for non-essential purposes (and requires social distancing at all times). It also provides that "[v]iolation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both" (*Id.* at 1), and further provides that "violation of any provision of this Order constitutes an imminent threat and menace to public health" and "constitutes a public nuisance" (*Id.* ¶ 15).  The March 31 Order was effective from March 31 at 11:59 p.m. through May 3, 2020, at 11:59 p.m. (*Id.* ¶ 16).

31.     On April 29, 2020 the County of San Francisco extended the previous orders (with modifications not relevant here) to May 31, 2020. They were subsequently revised and extended again on May 17, 2020, June 11, 2020, July 13, 2020, July 20, 2020, and August 14, 2020. Collectively all of these San Francisco orders, and subsequent related orders, shall be referred to as the "San Francisco Orders".

32.     Other local governments throughout California and the country have experienced confirmed infections in their jurisdictions and adopted similar approaches, requiring large scale business closures and imposing other limitations on customer and employee movement that prevent businesses from operating and/or force them to suffer losses.

33.     For example, on March 15, 2020, Mayor Eric Garcetti of Los Angeles issued an order restricting similar activities throughout the City and County of Los Angeles.  Ex. 4.  The order indicates that "[a]ll restaurants and retail food facilities in the City of Los Angeles shall be prohibited from serving food for consumption on premises."  *Id.* at ¶ 2.  On March 16, 2020, the Health Officer of Los Angeles County, Muntu Davis, M.D., MPH, issued an order directing all individuals living in the county to stay at home unless they are providing or receiving certain essential services or engaging in certain essential activities.

34.     On March 19, 2020 California Governor Newsom issued an executive order requiring "all individuals living in the State of California to stay home or at their place of residence except as needed" for essential services and needs and engage in strict social distancing. Ex. 5 at ¶ 1.[13]  This order and its restrictions have been extended and reaffirmed, with modifications not relevant here, through the date of this complaint.

35.     Collectively, the above-referenced orders of the State of California and the County of San Francisco are referred to herein as the "Orders."

36.     On March 28, 2020 the United States Department of Homeland Security issued a memorandum concerning the "Identification of Essential Critical Infrastructure Workers During

---

[13] *Available at* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (last visited April 22, 2020).

Covid-19 Response."[14]  This memorandum provided guidance for the implementation and standardization of all state shelter in place orders and the restrictions they place on different essential and non-essential businesses.

37.     Statewide efforts similar to California's have been implemented around the country in responses to thousands if not tens or hundreds of thousands of confirmed inflections. State governments have required large scale business closures and imposed other limitations on customer and employee movement that prevent restaurants from operating and/or force them to suffer losses.

38.     For example, on March 16, 2020, New York Governor Andrew Cuomo, in conjunction with New Jersey Governor Phil Murphy and Connecticut Governor Ned Lamont ordered the closure of all gyms, movie theaters, bars and casinos.  Ex. 6–8.[15]  Restaurants were also ordered to close except for the fulfillment of take-out and delivery orders.  *Id.*

39.     In all, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting dine in service and other operations at restaurants.[16]  South Dakota is the only state whose government may not yet have enacted such an order at the state level.

40.     The Orders were issued due to direct physical loss of and/or direct physical damage to properties. As reflected, for example, by an April 10, 2020 proclamation by the City and County of San Francisco, local authorities acted "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time." Ex. 3 at 2.  *See also*

---

[14] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_ Essential_Critical_Infrastructure_Workers_1.pdf

[15] These orders were subsequently extended until May 15, 2020 by Governors Cuomo (NY), Murphy (NJ), and Lamont (CT).  *See* Caitlin Oprysko, Politico (April 16, 2020), "More than a dozen states have extended stay-home orders past White House deadline," https://www.politico.com/news/2020/04/16/coronavirus-stay-home-orders-extended-190889 (last accessed May 5, 2020).

[16] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 3, 2020)

Ex. 12 (reflecting similar findings in Los Angeles County) Ex. 13 (reflecting similar findings in Sonoma County).  In each jurisdiction, there were numerous individuals who tested positive for COVID-19, and the number of positive tests continues to grow.  Further, COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties; and because COVID-19 was and is being transmitted in or between properties throughout these areas, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces.  The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties. The Orders were issued by governmental entities due to these types of direct physical loss of, and/or direct physical damage to, properties within their respective jurisdictions.

### C.    <u>The Restaurants Close</u>

41.    Under the Orders, the Restaurants were forced to close their dining rooms to the public, thereby prohibiting access to, use of, and operations at the Restaurants.

42.    Under the Orders, the Restaurants were forced to suspend dine in food offerings at the Restaurants and service of dine in food to customers, thereby prohibiting access to, use of, and operations at the Restaurants.

43.    Under the Orders, customers were prohibited from accessing and using the Restaurants' dining rooms, thereby prohibiting access to, use of, and operations at the Restaurants.

44.    Under the Orders, customers were prohibited by social distancing guidelines from accessing and utilizing the Restaurants' dining rooms, thereby prohibiting access to, use of, and operations at the Restaurants.

45.    Under the Orders, the Restaurants' employees were prohibited from traveling to or accessing the Restaurant for purposes of preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Restaurants.

46.     Under the Orders, the Restaurants' employees were prohibited from traveling to or accessing portions of the Restaurant utilized exclusively for preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Restaurants.

47.     Under the Orders, the Restaurants' employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at the Restaurants.  This includes, but is not limited to, social distancing requirements and other safety requirements that are not compatible with professional use of a kitchen.

48.     Under the Orders, both Restaurants lost access to portions of the Restaurants (and property therein), lost use of the Restaurants (and property therein), lost necessary use of necessary facilities at the Restaurants (and property therein), and suspended operations at the Restaurants.

49.     As a result, both Restaurants were rendered untenantable and both Restaurants suffered and continue to suffer substantial lost business income and other financial losses.

50.     These extraordinary losses of business income (and concern for their employees' welfare) are precisely why the Restaurants took out insurance policies with Defendant that included business interruption coverage, which were meant to cover these losses.

**D.     The Losses From These Closures Are Covered Business Interruptions**

51.     The Restaurants purchased insurance policies from Defendant that included business interruption (and other related) insurance coverage.

52.     Plaintiff Nari has promptly and dutifully paid its premiums and complied with all other elements of its agreements with Defendant.  Nari's policy number is BSP722439.

53.     Plaintiff Kin Khao has promptly and dutifully paid its premiums and complied with all other elements of its agreements with Defendant.  Kin Khao's policy number is BSP720113. Collectively BSP722439 and BSP720113 shall be referred to as the "Policies."

54.     In many countries, property insurance is sold on a specific peril basis. Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or

terrorist attack.  Most property policies sold in the United States are all-risk property damage policies which cover losses from all causes that are not expressly excluded.

55.    The Policies are all-risk property damage policies because their terms indicate that they cover all risks which can cause harm to physical property except for risks that are expressly and specifically excluded.  In the Businessowner's Coverage Form provided to Plaintiffs, under the heading "Covered Causes of Loss," Defendant agreed to cover and pay for all "direct physical loss unless the loss is [e]xcluded or . . . [l]imited by" the Businessowner's Coverage Form. Ex. 9 at p. 9; Ex. 10 at p. 2.

56.    The Policies provide coverage for Lost Business Income, promising that Defendant "will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'.  The suspension must be caused by direct physical loss of or physical damage to property at the 'described premises' . . . caused by or result[ing] from a Covered Cause of Loss."  Ex. 9 at p. 12; Ex. 10 at p. 5.

57.    The Orders prohibited certain physical access to, use of, and operations at and by the Restaurants, their employees, and their customers. This includes, among other things, loss of the ability to welcome customers onto the Restaurants' physical premises, offer the physical dining experience of eating on site, and use any of the physical property associated with these activities. As a result of the Orders, physical components of the Restaurants became unusable, damaged, and/or lost the ability to generate income.

58.    The Policies define a "slowdown or complete cessation of your business activities" as a suspension for purposes of assessing this coverage. Ex. 9 at 13; Ex. 10 at 6.

59.    As a result of this physical loss or damage, the Restaurants suspended operations, lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

60.    The Restaurants' Policies also provide Civil Authority coverage, pursuant to which Defendant agreed that it "will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described

premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Ex. 9 at p. 14; Ex. 10 at p. 7.

61.    The Restaurants are located in San Francisco.  As the Coronavirus spread, the streets on which the Restaurants are located, and the buildings and objects in and around them, became a breeding ground for the disease.

62.    The Orders were issued due to direct physical loss of and/or direct physical damage to properties.  There are numerous individuals who had tested positive for COVID-19, and those numbers continue to grow.  COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties near the Restaurants; and because COVID-19 was and is being transmitted in or between properties throughout the areas near the Restaurants, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces.   The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties, and this direct physical loss and/or direct physical damage prompted the issuance of the Orders. Underscoring this, prior to the issuance of the Orders, government authorities had been limiting access to other properties on the basis of the Coronavirus, including (but not limited to) sporting arenas, concert venues, and other places where large numbers of people may gather.

63.    The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by the Restaurants, their employees, and their customers.  As a result of the Orders, components of the Restaurants became unusable and/or lost the ability to generate income.

64.    As a result, the Restaurants lost business income, and suffered other related covered losses (including but not limited to extended business income and extra expenses).

65.    COVID-19 is a Covered Cause of Loss under the Policies.

66.    The Businessowner's Coverage Form which defines the Policies' Lost Business Income and Civil Authority coverage is a standardized form drafted by the Insurance Services

Office ("ISO"). On information and belief, the form used for the Policy is also used by Defendant for numerous other insurance policies issued by Defendant to the Class members.

67.    The ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

68.    In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents.  Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

69.    When preparing CP 01 40 07 06, ISO, circulated a statement to state insurance regulators that included the following acknowledgement:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

70.    The insurance industry has thus recognized that the presence of virus or disease can constitute physical damage to property since at least 2006.

71.    Defendant intentionally chose not to include CP 01 40 07 06 in the Policies and in its insurance policies issued to other Class members.

72.    The Policies (Ex. 9 at p. 48-49; Ex. 11 at p. 4-5) contain exclusions for any loss "caused directly or indirectly" by acts of biological terrorism, including any "dispersal . . .  of pathogenic . . . material."  These exclusions are not applicable to the losses suffered by the Restaurants described herein.

73.    Defendant chose not to include similar language in the Policies or in insurance policies issued to other Class members that would cover catastrophic disease outbreaks that are unrelated to terrorism, like pandemics.

74.    Defendant is aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

75.    Defendant chose not to use force majeure clauses in the Policies or in insurance policies issued to other Class members.

### E.    Defendant's Denial of Plaintiffs' Insurance Claim

76.    On or around March 23, 2020, Plaintiff Nari requested insurance coverage from Defendant. This claim was later assigned the identifying number 254891.

77.    According to correspondence later received by Plaintiff, Defendant finalized a letter denying that claim on or around April 1, 2020.

78.    On or around March 24, 2020, Plaintiff Kin Khao requested insurance coverage from Defendant. This claim was later assigned the identifying number 254890.

79.    According to correspondence later received by Plaintiff, Defendant finalized a letter denying on or around April 16, 2020.

80.    Defendant denied Plaintiffs' claims without any inspection or review of the Restaurants' physical locations or documents concerning their business activities in 2020.

81.    Defendant has thereby waived any right to inspect those premises, deny coverage for any reason related to conditions at those locations, or raise any defense related to conditions at those locations or facts specific to the Restaurants.

82.    The rapidity of Defendant's denial of the Restaurants' claims, and their lack of consideration given to the specific details of the claim, indicate that Defendant could not have engaged in a good faith or reasonable investigation of the claims which included assessment of facts or issues relevant to the Restaurants.

83.     Defendant accepted the premiums paid by the Restaurants with no intention of providing lost business income, physical damage, civil authority, or other applicable coverage for claims like those submitted by Plaintiffs and the proposed Class members and which were denied by Defendant.

84.     Defendant's rejection of the Restaurants' claims was part of a policy by Defendant to limit its losses during this pandemic, notwithstanding that the Policies provide coverage for losses due to loss of use of property and from closure orders issued by civil authorities (among other coverage).

85.     Although industry trade groups have argued that insurance companies do not have the funds to pay claims related to the Coronavirus and will require government assistance, the reality is that insurers are simply trying to minimize their exposure.  "According to data from ratings firm A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for future payouts.[17]

86.     Upon information and belief, Oregon Mutual collected at least tens of millions of dollars in property insurance premiums in 2019 alone.  Notwithstanding this, Defendant appears to be categorically denying claims brought by businesses ordered to close following the Coronavirus, including those brought by Plaintiffs and the proposed Class.  This deliberate strategy and common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

87.     Defendant's wrongful denials of the Plaintiffs' claims were not isolated incidents. Rather, on information and belief, Defendant has engaged in the same misconduct, alleged herein with respect to Plaintiffs, in connection with claims submitted by numerous of Defendant's insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied.

---

[17] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).

88.     Plaintiffs' claims and those of the proposed Class all arise from a single course of conduct by Defendant: its systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

89.     Defendant's wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage, to Plaintiffs and the other members of the proposed Class.

90.     Defendant's categorical treatment, failure to investigate in good faith, and denial of Plaintiffs' and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

## V.     <u>CLASS ACTION ALLEGATIONS</u>

91.     Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring their claims (as further indicated below) on behalf of themselves and a "Class" and "California Subclass" defined as:

**Class**
All persons or entities in the United States (including its territories and the District of Columbia) who own an interest in a business that served food on the premises and was insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

**California Subclass**
All persons or entities who own an interest in a business in California that served food on the premises and was insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

92.     Excluded from the Class and California Subclass are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class;

governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class and/or California Subclass definitions based upon information learned through discovery or as otherwise may be appropriate.

93.     Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seeks to represent the above California Subclass as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification.

94.     **Numerosity: Rule 23(a)(1).** The Class and California Subclass are too numerous and dispersed for joinder of all Class members to be practicable.  On information and belief, the Class and California Subclass each consist of at least hundreds, if not thousands, of persons and entities.  The precise number of Class and California Subclass members can be ascertained from Defendant's records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

95.     **Commonality: Rules 23(a)(2)**. This action involves significant common questions of law and fact, including, but not limited to:

a.      Whether the insurance policies issued by Defendant to Plaintiffs and the Class are all-risk policies?

b.      Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 required a suspension at businesses serving food on the premises?

c.      Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 prohibited access at businesses serving food on the premises?

d.      Whether Defendant's Business Income coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

e.      Whether Defendant's Civil Authority coverage applies to a loss of business income caused by the orders of local, municipal, city, county, and/or state or

national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States;

f.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 breach Defendant's insurance contracts?

g.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unfair business practice?

h.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are a deceptive fraudulent business practice?

i.   Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unlawful business practice?

j.   Whether Plaintiffs and the Class members are entitled to a declaratory judgment as to the meaning of their policies?

96.   ***Typicality: Rule 23(a)(3).*** Plaintiffs' claims are typical of the claims of the Class and California Subclass members whom they seek to represent.  Plaintiffs and all Class members purchased insurance coverage from Defendant that included coverage for business interruption and all had claims denied pursuant to Defendant's misconduct alleged herein.  Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

97.   ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately represent and protect the interests of the Class and California Subclass members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members.

98.    *Rule 23(b)(2).* Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class and California Subclass, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class and California Subclass as a whole.

99.    *Rule 23(b)(3).* Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

100.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of Plaintiffs and the Class)

101.    Plaintiffs re-allege and incorporate by reference into this claim for relief all allegations set forth in paragraphs 1–100 of this Complaint.

102.    Plaintiffs bring this claim for relief on behalf of themselves and the proposed Class.

103.    At all times relevant herein, Plaintiffs and the Class have paid all premiums and fulfilled or performed all obligations they have to Defendant, including those under all relevant insurance policies described in this complaint.

104.    Defendant had contractual duties to provide Plaintiffs and the Class with insurance coverage, as alleged herein.

105.    By its conduct alleged herein, including denying Plaintiffs' and the Class members' insurance claims and refusing to perform under the contract, Defendant breached those duties.

106.    As a result of Defendant's breaches, Plaintiffs and the Class have been damaged in the amount of coverage to which they are entitled their insurance agreements, the premiums they paid, and in an amount to be proved at trial.  Plaintiffs seek compensatory damages with interest thereon for themselves and the Class members.

107.    Kin Khao attempted to mitigate the lost income but has been unable to.  Under the Orders, Kin Khao is not permitted to access or make any use of its kitchen.  Since the Orders, Kin Khao's facilities have not been used to prepare any takeout, delivery, or outdoor dining orders.

108.    Nari attempted to mitigate the lost income but has been unable to.  Under the Orders, Nari initially had no choice but to close its entire Restaurant, which did not previously include takeout or delivery orders.  In order to try and mitigate its lost income, Nari subsequently experimented with new takeout products, menus, and business models, using a kitchen staffed by only a handful of employees.  Its initial attempts to serve certain new or different hot food items for takeout were unsuccessful.  After several weeks, it started focusing on cold food which customers could heat up at home.  It has also sold some of these meals to grocery stores and through the "San Francisco New Deal" low-cost food program.  These efforts have produced extremely modest amounts of income which are not remotely comparable to 2019 income during the same period and are insufficient to meet mounting expenses or bring large numbers of employees back onto the payroll. Since the Orders, Nari's facilities have not been used to prepare any delivery or outdoor dining orders.

## SECOND CLAIM FOR RELIEF
### Breach of Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Class)

109.     Plaintiffs re-allege and incorporate by reference into this claim for relief all allegations set forth in paragraphs 1–100 of this Complaint.

110.     Plaintiffs bring this claim for relief on behalf of themselves and the proposed Class.

111.     When Defendant entered its agreements with Plaintiffs and the Class, and with an successive amendments thereto, Defendant undertook and were bound to covenants implied by law that they would deal fairly and in good faith with Plaintiffs and the Class, and not engage in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiffs and the Class or defeat the reasonable expectations of Plaintiffs and the Class under the their agreements with Defendant.

112.     By its conduct alleged herein, Defendant breached the implied covenant of good faith and fair dealing arising out of its agreements with Plaintiffs and the Class including but not limited to by: (a) unreasonably and in bad faith denying Plaintiffs and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiffs' and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of its insurance policies for the purpose of denying coverage due.

113.     In committing its breaches, Defendant has acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiffs' and the Class members' rights and welfare, thereby entitling Plaintiffs and the Class members to punitive and exemplary damages against the Defendant.  As a direct and proximate result of the above-referenced breach, Plaintiffs have had to retain attorneys to enforce their rights, and those of the proposed Class, to the insurance coverage to which they are entitled and have thereby been injured and damaged.

114.    Plaintiffs, therefore, are entitled to recover and seek in connection with this Claim for Relief for themselves and the Class: (a) an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; (b) punitive and exemplary damages in an amount to be determined at trial; (c) costs of suit; and (d) reasonable attorney's fees in connection with this action.

**THIRD CLAIM FOR RELIEF**
**Unfair Business Practices Under Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf of Plaintiffs and the California Subclass)**

115.    Plaintiffs re-allege and incorporate by reference into this claim for relief all allegations set forth in paragraphs 1–100 of this Complaint.

116.    Plaintiffs bring this claim for relief on behalf of themselves and the proposed California Subclass.

117.    By its conduct alleged herein, Defendant has engaged in unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code §§ 17200 *et seq.* ("UCL")

118.    Defendant's conduct alleged herein violates the "unlawful" prong of the UCL because it violated the letter and spirit of California's Insurance Code, including California Insurance Code section 790, *et seq.* because, *inter alia*, Defendant failed or refused to perform a fair, objective, and thorough investigation of the Plaintiffs' and the California Subclass members' claims.  As alleged herein, Defendant denied Plaintiffs' and the California Subclass members' claims as part of Defendant's  policy of categorically denying all or at least the vast majority of business interruption claims related to the Coronavirus, and ignored other California requirements concerning the proper and fair evaluation of claims and interpretations of its policies.  Defendant's conduct alleged herein also constituted breaches of contract and breaches of the implied covenant of good faith and fair dealing, in violation of California common law.

119.    Defendant's conduct alleged herein violates the "unfair" prong of the  UCL, including but not limited to Defendant's: (a) categorical and wrongful denial of Plaintiffs' and the California Subclass members' claims under the circumstances described in this complaint; (b) failure and refusal to perform a fair, objective, good-faith, and thorough investigation of the claims as directed by the California Insurance Code; (c) denial of Plaintiffs' and the California Subclass members' claims as part of a policy of categorically denying claims related to the Coronavirus; and (d) and failing to interpret its policies in an equitable manner and/or up to the standards required by California law (including but not limited to Cal. Ins. Code section 790 *et seq.*).

120.    Defendant's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the California Subclass.  There is no utility to Defendant's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Defendant's conduct alleged herein.

121.    Defendant's conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Ins. Code § 790 *et seq*. and elsewhere in the California Insurance Code.

122.    Defendant's conduct alleged herein violates the "fraudulent" prong of the UCL. Among other things, Defendant: (a) promised Plaintiffs and the California Subclass coverage that was not provided and that Defendant had no intention of providing; (b) promised to evaluate each claim individually, reasonably, and in good faith, which Defendant did not do with respect to Plaintiffs' and the California Subclass members claims;  falsely and misleadingly indicated to Plaintiffs and the California Subclass that it was investigating in good faith (and had investigated in good faith) their claims which Defendant did not do and knew that it did not do.  Defendant collected Plaintiffs' and the California Subclass members' premiums in exchange for coverage that was not provided, induced those premiums by promising to evaluate each claim individually, reasonably, and in good faith and did not, and denied Plaintiffs' and the California Subclass

members' claim as part of a policy of categorically denying claims related to the Coronavirus as part of a strategy to reduce its total insurance payments related to the Coronavirus.

123.    Defendant's fraudulent and deceptive conduct alleged herein was false and misleading had a tendency to deceive reasonable insureds, and did deceive Plaintiffs and the California Subclass.  Plaintiffs and the California Subclass members reasonably relied on Defendant's deceptions and omissions alleged herein, including but not limited to by paying premiums to Defendant.

124.    To the extent Defendant's insurance policies offer coverage that is entirely or almost entirely excluded by other provisions of the policies, its offers of coverage and related communications are fraudulent, unfair, and unlawful. Specifically they deliberately and fraudulently induce Plaintiffs and class members to purchase insurance based on false premises which they would have known that Plaintiffs and class members would reasonably rely upon. Such conduct is particularly deceptive and unfair to the extent that the true nature of the illusory coverage is not readily discernable, particularly to a layperson, from the language of the policy. Indeed based on the decision to include certain coverages in a policy, a purchaser of insurance would reasonably assume that there is no exclusion which effectively nullifies that coverage. Such deception in the sale of insurance is also illegal under California law. *See, e.g.* Cal. Ins. Code § 790 *et seq*.

125.    By reason of Defendant's unlawful, unfair, and fraudulent conduct in violation of the UCL, Plaintiffs and the California Subclass members suffered and continue to suffer damages, including but not limited to premiums they have paid to Defendant and the non-receipt of insurance benefits that are owed to them by Defendant.

126.    Plaintiffs and the California Subclass are entitled to restitution from Defendant (with interest thereon), to disgorgement of all Defendant's profits arising out of its violations of the UCL (with interest thereon), and to be paid benefits due to Plaintiffs and the California Subclass members that Defendant has wrongfully retained by means of its violations of the UCL.

127.    Pursuant to California Code of Civil Procedure section 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees.

## FOURTH CLAIM FOR RELIEF
### Declaratory Relief
### (On Behalf of Plaintiffs and the Class)

128.    Plaintiffs re-allege and incorporate by reference into this claim for relief all allegations set forth in paragraphs 1–100 of this Complaint.

129.    Plaintiffs bring this claim for relief on behalf of themselves and the proposed Class.

130.    The Court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

131.    An actual controversy has arisen between Plaintiffs and the Class and Defendant as to their respective rights and duties under Plaintiffs' and the Class members' insurance policies.

132.    Resolution of the parties' respective rights and duties under Plaintiffs' and the Class members' insurance policies by declaration of the Court is necessary, as there exists no adequate remedy at law.

133.    Plaintiffs allege and contend, with respect to Plaintiffs' and the Class members' Civil Authority coverage, that the above-described orders trigger that coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit access to the premises in question, including prohibiting potential on-premises dining customers and workers from accessing the premises in question, (c) such access prohibition has been continuous and ongoing since the orders were issued, such that the prohibited access has not subsequently been permitted, (d) the orders prohibit access as the direct result of direct physical loss of or damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiffs and the

Class have suffered actual and covered loss of Business Income in an amount to be determined at trial, and (g) coverage should begin as of dates to be determined at trial.

134.    Plaintiffs allege and contend that Plaintiffs' and the Class members' Lost Business Income Coverage is triggered because (a) Plaintiffs and the Class members have sustained actual loss of Business Income due to the closure of their businesses, (b) said closure constitutes a necessary suspension of their operations under their insurance policies, (c) this suspension has been and is caused by direct physical loss of or physical damage to property at the premises in question, including personal property in the open (or in a vehicle) within 1,000 feet of the premises in question, due to the presence of Coronavirus, (d) the presence of Coronavirus is a Covered Cause of Loss, and (e) some or all of the periods of the Plaintiffs' and Class members' closures are within the period of restoration under their insurance policies.

135.    Plaintiffs allege and contend that Defendant wrongly denied coverage with respect to all the foregoing provisions, as to Plaintiffs and the Class.

136.    Upon information and belief, Plaintiffs allege that Defendant dispute and deny each of Plaintiffs' contentions set forth in this Claim for Relief.

137.    Plaintiffs, therefore, seek a declaratory judgment, on behalf of themselves and the Class, regarding each of the contentions set forth in this Claim for Relief.  A declaratory judgment determining that Plaintiffs and the Class are due coverage under their insurance policies, as set forth above, will help to ensure the survival of these businesses during this prolonged closure made necessary by the orders and by the presence of Coronavirus around the businesses during this global pandemic.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and California Subclass, pray for judgment in their favor and against Defendant, as follows:

a.    For a declaration adopting each of Plaintiffs' contentions set forth in the above Claim for Relief for Declaratory Relief;

b.    For injunctive relief enjoining and restraining Defendant's unlawful, unfair, and/or deceptive conduct as alleged herein, including but not limited to its unlawful, unfair, and/or deceptive business practices and its wrongful denials of coverage under Plaintiffs' and the Class' and California Subclass' insurance policies;

c.    For specific performance of the insurance policies;

d.    For general and compensatory damages, restitution, and disgorgement, in an amount to be determined at trial;

e.    For costs of suit;

f.    For reasonable attorney's fees incurred in this action pursuant to California Code of Civil Procedure section 1021.5 or as otherwise recoverable;

g.    For pre judgment and post-judgment interest; and

h.    For such other relief as the Court may deem proper.

## VIII.  **<u>JURY TRIAL DEMAND</u>**

Plaintiffs demand a trial by jury.

Dated:  August 27, 2020       STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

*/s/ Steve D. Larson*
Steve D. Larson, OSB No. 863540
slarson@stollberne.com
Elizabeth K. Bailey, OSB No. 172956
ebailey@stollberne.com
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

-And-

Robert J. Nelson
Fabrice N. Vincent
Jacob H. Polin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Alexandra L. Foote
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  786.408.8083
Facsimile:  415.956.0561

*Attorneys for Plaintiffs*