IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NARI SUDA LLC, a Delaware
corporation, dba Nari; and Pakin                    No. 3:20-cv-01476-HZ
Corporation, a California corporation, dba
Kin Khao, on behalf themselves and all             OPINION & ORDER
others similarly situated,

               Plaintiffs,

   v.

OREGON MUTUAL INSURANCE
COMPANY, an Oregon corporation,

               Defendant.

Steve D. Larson
Elizabeth K. Bailey
Stoll Stoll Berne Lokting & Schlachter P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204

Robert J. Nelson
Fabrice N. Vincent
Jacob H. Polin
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

Alexandra L. Foote
Law Office of Alexandra L. Foote, P.C.
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

     Attorneys for Plaintiffs

R. Lind Stapley
SOHA & LANG P.S.
1325 Fourth Avenue, Suite 2000
Seattle, WA 98101-2750

Clarke Benbow Holland
Pacific Law Partners, LLP
2000 Powell Street, Suite 950
Emeryville, CA 94608

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiffs, Nari Suda LLC dba Nari ("Nari"), and Pakin Corporation dba Kin Khao ("Kin Khao"), are California restaurants insured by Defendant, Oregon Mutual Insurance Company. Plaintiffs bring class action claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief based on Defendant's denial of their claims for insurance coverage for financial losses stemming from state and local government closure orders issued in response to the COVID-19 pandemic. Plaintiffs also bring a claim for violation of California's unfair competition law. Defendant moves to dismiss.

     Many businesses suffered extreme hardship and financial loss as a result of the government shutdown orders that state and local governments nationwide issued to curb the spread of COVID-19 infections throughout the country. People across the world have lost their lives and livelihood as a result of the pandemic. The Court sympathizes with the plight of businessowners who suffered significant and even catastrophic financial losses as a result of the

government closure orders. Plaintiffs' business insurance policy, however, does not cover its loss of business income. The Court grants Defendant's motion to dismiss.

## BACKGROUND

Plaintiffs operate dine-in Thai influenced restaurants located in San Francisco, California. Compl. ¶ 1, ECF 1. Plaintiffs allege that in March 2020, the state of California and the San Francisco Department of Public Health issued orders in response to the COVID-19 pandemic that forced Plaintiffs to temporarily close their restaurants, close their dining rooms, and "create new business models" to serve take out. *Id.* ¶¶ 2, 108. The orders imposed social distancing guidelines, restricted nonessential business operations, and restricted all restaurants to providing only takeout and delivery services. *Id.* ¶¶ 27–31. Plaintiffs filed an insurance claim seeking coverage for financial losses stemming from their reduced business operations. *Id.* ¶ 76, 79. Plaintiffs allege that several provisions of their business insurance policies cover their financial losses. *Id.* ¶¶ 62, 64. Defendant denied coverage. *Id.* ¶¶ 77, 79, 88.

Section I of the Policy, which provides property coverage, states: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Compl. Ex. 9 (Nari Suda Policy) at 9, ECF 1-9; Compl. Ex. 10 (Pakin Policy) at 10. The capitalized phrases in that sentence are defined terms. The phrase "direct physical loss of or damage to" is not defined in the policy. "Covered Property" includes Buildings, Business Personal Property, or both, unless it is a kind of Property Not Covered. Policy 9.[1] A "Covered Cause of Loss" is a risk of "direct physical loss" unless the loss is excluded or limited by other provisions in Section I. *Id.* at 10.

---

[1] Because the relevant provisions of Pakin Corporation's policy and Nari Suda's policy are identical, the Court refers to both policies collectively as the "Policy" and cites only to Nari Suda's policy, Compl. Ex. 9, throughout the remainder of this Opinion.

The Policy provides "Additional Coverages" that include "Business Income," "Extended Business Income," "Extra Expense," and "Civil Authority" coverages. *Id*. at 13–15. The Business Income coverage provision states, in part:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id*. at 13. The Extended Business Income coverage provides, in part:

> If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur[.] . . . Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any covered cause of loss.

*Id*. at 13–14. The word "suspension" means "[t]he partial slowdown or complete cessation of your business activities" and "[t]hat a part or all of the described premises is rendered untenantable, if coverage for Business Income applies." *Id*. at 13.

*Id*. at 14. The Civil Authority coverage states, in part:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

*Id*. at 15.

The Policy also includes several exclusions. One of those exclusions relates to the enforcement of an ordinance or law ("Ordinance or Law Exclusion"):

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> **a. Ordinance Or Law**
> **(1)** The enforcement of any ordinance or law:

     **(a)** Regulating the construction, use or repair of any property; or

     **(b)** Requiring the tearing down of any property, including the cost of removing its debris.

   **(2)** This exclusion, Ordinance Or Law, applies whether the loss results from:

     **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

     **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

*Id*. at 19.

## STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id*. (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In other words, a complaint must state a plausible claim for relief and contain "well-

pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## DISCUSSION

Defendant moves to dismiss Plaintiffs' complaint because no "direct physical loss of or damage to" property occurred to invoke coverage under the Business Income and Civil Authority coverages, and no "direct physical loss or damage to" property occurred that would provide coverage under the Extra Expense coverage. Defendant also argues that the Ordinance or Law Exclusion excludes coverage for Plaintiffs' losses.

Plaintiffs argue that the Policy's undefined terms "loss of," "damage to" and "direct physical loss" cover Plaintiffs' loss of the functionality and use of its covered property for dine-in services due to the closure orders. The Court disagrees.

## I.    Applicable Law

The parties assert that California law applies to the interpretation of the Policy. Def. Mot. Dismiss (Def. Mot.) 15, ECF 24; Pl. Resp. Mot. Dismiss (Pl. Opp'n) 4, ECF 25. The Court finds that Oregon law applies to the resolution of Defendant's motion to dismiss.

A federal court sitting in diversity applies the forum state's choice of law rules to determine what law applies. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 975 (9th Cir. 2013). Thus, Oregon's choice of law rules will determine whether the Court should apply Oregon or California law to construe the terms of the Policy. *Id.*

Generally, when parties to a contract clearly express in the contract the law that applies, "the contractual rights and duties of the parties are governed by the law or laws that the parties have chosen." Or. Rev. Stat. § ("O.R.S.") 15.350(1)–(2). Because the insurance contract does not contain a choice of law provision, O.R.S. 15.360 applies. O.R.S. 15.360 established the process

for determining what law applies when the parties have not made an effective choice of law in the contract. Under that statute, the court must identify the most appropriate law to apply by:

(1) Identifying the states that have a relevant connection with the transaction or the parties, such as the place of negotiation, making, performance or subject matter of the contract, or the domicile, habitual residence or pertinent place of business of a party;

(2) Identifying the policies underlying any apparently conflicting laws of these states that are relevant to the issue; and

(3) Evaluating the relative strength and pertinence of these policies in:

(a) Meeting the needs and giving effect to the policies of the interstate and international systems; and

(b) Facilitating the planning of transactions, protecting a party from undue imposition by another party, giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states.

O.R.S. 15.360.

As to the first factor, the states with a relevant connection to the transaction and parties are Oregon and California. Defendant's principal place of business is located in Oregon. Compl. ¶ 8. Defendant issued an insurance contract that insured Plaintiffs, both of which are California businesses, and covered Plaintiffs' business property located in California. Policy 4. The Policy includes an endorsement entitled "California Changes – Businessowners" which amends certain portions of the Policy. *Id.* at 87. The performance of the contract occurred in California, and Plaintiffs' alleged losses occurred in California. Compl. ¶ 59. Thus, both Oregon and California have a "relevant connection with the transaction or the parties[.]" *See Portfolio Recovery Assoc., LLC v. Sanders*, 366 Or. 355, 371 (2020) (holding that O.R.S. 15.360 does not limit "relevant connection[s]" to those that existed at the time of the transaction).

The second factor asks the court to identify the policies undergirding any apparent conflict between the relevant states' law. The Court finds that there is no apparent conflict between Oregon and California law concerning the interpretation of insurance contract language. Both states' law applies general contract interpretation principles aimed at giving effect to the mutual intent of the parties. *Compare Am. Claims Mgmt., Inc. v. Allied World Surplus Lines Ins. Co.*, 484 F. Supp. 3d 869, 875 (S.D. Cal. 2020) ("While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.") (quotation marks omitted) *with Ortiz v. State Farm Fire & Cas. Co.*, 244 Or. App. 355, 360–61 (2011) (noting that interpreting a term of the insurance policy required determining the intent of the parties given the ordinary meaning of the term). Both states' laws begin with determining the plain meaning of the terms to determine whether the terms are ambiguous because they have more than one plausible meaning. *Am. Claims Mgmt., Inc.*, 484 F. Supp. 3d at 874–75; *Ortiz*, 244 Or. App. at 360. If the terms of the contract are unambiguous, the courts of both states apply the plain meaning and conduct no further analysis. *Am. Claims Mgmt., Inc.*, 484 F. Supp. 3d at 874–75; *Ortiz*, 244 Or. App. at 360. Thus, there is no "apparent conflict" between California and Oregon law concerning the interpretation of insurance contracts. O.R.S. 15.360(2). As a result, the Court will apply Oregon law. *Portfolio Recovery Assoc.*, 366 Or. at 374 (". . . when the laws are not 'apparently conflicting,' there is no path to choosing the law of another state unless the parties have made an 'effective choice' of law to govern the contract claim.").

## II.    Coverage Provisions

Defendant argues that Plaintiffs' pandemic-related business losses are not covered under the terms of the Policy because no risk of direct physical loss to Plaintiffs' businesses occurred. Determining whether insurance coverage exists is a two-step process. First, the insured bears the

burden to establish that the loss falls within the Policy's grant of coverage. *ZRZ Realty Co. v. Beneficial Fire & Cas. Co.*, 222 Or. App. 453, 465 (2008). If the insured meets that burden, then the insurer bears the burden of establishing that an exclusion applies. *Id.*

To determine whether the Policy covers Plaintiffs' claims, the Court must first decide whether Plaintiffs' alleged losses were caused by or resulted from a "Covered Cause of Loss." The Policy defines Covered Causes of Loss as "[r]isks of direct physical loss" unless otherwise limited or excluded under other provisions of the Property coverage. Policy 10. Next, the Court must determine whether a Covered Cause of Loss caused or resulted in (1) "direct physical loss of or damage to property" as required to invoke coverage under the Business Income and Civil Authority Coverages; and (2) "direct physical loss or damage to property," as required to invoke coverage under the Extra Expense coverage. Policy 13–15. If coverage exists, then the Court determines whether Plaintiffs' claims fall within a policy exclusion. *ZRZ Realty Co.*, 222 Or. App. 453 at 465.

Interpretation of an insurance policy is a question of law. *Holloway v. Rep. Indem. Co. of Am.*, 341 Or. 642, 649 (2006). To interpret an insurance policy, the court must "ascertain the intention of the parties to the insurance policy." *Id.* (citing *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992)). "If an insurance policy defines the phrase in question, [then the court] applies that definition." *Id.* at 650. If the insurance policy does not define the phrase, the court first considers whether it has a plain meaning. *Id.* If so, the court applies that meaning and conducts no further analysis. *Id.* If the phrase "has more than one plausible interpretation," then the court examines "the phrase in light of the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole." *Id.* (quotation marks and citation omitted). If a term of the policy remains ambiguous after engaging in those exercises, then "'any

reasonable doubt as to the intended meaning of such [a] term[] will be resolved against the insurance company[.]'" *Id.* (quoting *N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 25 (2001)). A term is ambiguous only if it is susceptible to more than one plausible interpretation. *Id.*

None of the parties argue that the relevant policy provisions are ambiguous. The Court agrees with the courts which have construed the phrase "physical loss of or damage to covered property" and similar language and finds that the relevant policy language is unambiguous. *See, e.g.*, *Protégé Rest. Partners, LLC v. Sentinel Ins. Co., Ltd.*, ____ F. Supp. 3d ____, 2021 WL 428653, at *4 (N.D. Cal. Feb. 8, 2021) (finding the phrase "direct physical loss of or physical damage to" unambiguous); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. Civ. 98-434-HU, 1999 WL 619100, at *5 (D. Or. Aug. 4, 1999) (same). Thus, the Court will construe the terms of the Policy by applying the definitions of the defined terms and the plain meaning of the undefined terms. *Holloway*, 341 Or. at 650. The parties also appear to implicitly agree that it is appropriate for the Court to decide this motion based on the Court's review of the Policy because it is incorporated by reference into Plaintiffs' Complaint and quoted extensively in the parties' briefing on this motion. Def. Mot. 13–15; Compl. ¶¶ 55–60.

A.    Plain Meaning of the Policy's Terms

Each of the coverage provisions apply only if a Covered Cause of Loss occurred. Policy 9 ("We will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss."). A "Covered Cause of Loss" is defined in the Policy as a risk of "direct physical loss." *Id.* at 10. The court determines whether words have a plain meaning by "reference to the usual source of ordinary meaning, the dictionary." *Phillips v. State Farm Fire & Cas. Co.*, 302 Or. App. 500, 506 (2020) (noting that "directly" means "without any intervening space or time : next in order[;] . . . "in a straight line: without deviation

of course." (quoting Webster's Third New Int'l Dictionary 641 (unabridged ed. 2002)). "Direct" means "'characterized by or giving evidence of a close esp. logical, causal, or consequential relationship.'" *Summit Real Est. Mgmt., LLC v. Mid-Century Ins. Co.*, 298 Or. App. 164, 177 (2019) (holding that "direct loss" means "loss resulting immediately and proximately from an event") (quoting Webster's Third New Int'l Dictionary 640).

"Physical" means "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary: material, natural[.]" Webster's Third New Int'l Dictionary 1706; *see also* 10A Couch on Insurance § 148.46 (3d ed. 2019) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property"). The dictionary defines "loss" as "the act or fact of losing : failure to keep possession : deprivation;" or "an instance of losing[.]" Webster's Third New Int'l Dictionary 1338.

Applying those definitions, the Court concludes that for a Covered Cause of Loss to have occurred, Plaintiffs must demonstrate that COVID-19 or the state and local closure orders caused harm to or destroyed its business property or dispossessed Plaintiffs of their business property.

   i. Meaning of "direct physical loss of or damage to property"

The Business Income provision covers the insured's lost income "caused by direct physical loss of or damage to property at the described premises." Policy 13. The Civil Authority provision covers lost business income when an action of civil authority prohibits access to the insured's property due to "direct physical loss of or damage to property" at a location other than

the insured's property. *Id.* at 15. Thus, whether those provisions cover Plaintiffs' losses turns on the meaning of "direct physical loss of or damage to property."

The word "damage" means "loss due to injury : injury or harm to person, property, or reputation[.]" Webster's Third New Int'l Dictionary 571. Applying that definition, the plain meaning of the phrase "direct physical loss of or damage to property" is direct (without any intervening space or time) physical (of or relating to natural or material things) loss of (the act or fact of losing) or damage (injury or harm) to property. The plain meaning of those terms thus requires a Covered Cause of Loss to directly cause property to be lost or physically damaged for coverage to exist under the Business Income and Civil Authority provisions. *See Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-cv-01932-CL, 2016 WL 3267247, at *5 (D. Or. June 7, 2016) ("physical loss or damage" means "any injury or harm to a natural or material thing"), *vacated by stipulation of the parties*, 2017 WL 1034203 (Mar. 6, 2017); *Columbiaknit, Inc.*, 1999 WL 619100, at *5 ("'The inclusion of the terms "direct" and "physical" could only have been intended to exclude indirect, nonphysical losses.'" (quoting *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. and Loan Ass'n*, 793 F. Supp. 259, 263 (D. Or. 1990))). *Cf. Wy. Sawmills, Inc. v. Transp. Ins. Co.*, 282 Or. 401, 406 (1978) (Including the word "'physical' in the phrase 'physical injury to . . . tangible property' . . . negates any possibility that the policy was intended to include 'consequential or intangible damage,' such as depreciation in value, within the term 'property damage.'").

The Civil Authority provision extends coverage for loss of Business Income and necessary Extra Expense "caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Policy 15. Thus,

the Civil Authority provision requires that an action of civil authority prohibited access to Plaintiffs' restaurants due to the destruction, dispossession of or injury to property other than Plaintiffs' property for coverage to apply.

        ii.     Meaning of "direct physical loss or damage to property" and "direct loss or damage to property"

The Extra Expense coverage covers "direct physical loss or damage to property." Policy 14. Despite the slightly different phrasing, the parties do not argue that the phrase "direct physical loss or damage to property" has a different meaning from the phrase "direct physical loss of or damage to property." The Court thus assumes, without finding, that the three phrases have the same plain meaning for purposes of this Opinion.

## III.   Application

Having determined the plain meaning of the undefined terms of the Policy, the Court now applies the plain meaning of those terms to the language of the Policy to determine whether coverage exists.

    A.     Business Income Coverage

Defendant argues that the phrase "direct physical loss of or damage to property" in the Business Income provision requires Plaintiffs to lose of possession of their property or demonstrate a physical alteration in the condition of their property for coverage to apply. Def. Mot. 9. The Court agrees.

Oregon courts have construed the phrase "direct physical loss of or damage to property" and similar phrases to require some degradation in the condition of the property to invoke coverage. In *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, this Court emphasized that a policy that covers "direct physical loss"—and the inclusion of the word "physical" in particular— covers only direct damage and does not extend to consequential damages. 1999 WL 619100, at

*4. Applying that construction, the Court held that the insurance policy of the plaintiff, a clothing manufacturer whose property had suffered water intrusion damage resulting in water damage to some of its merchandise, could recover only for the damage to the clothing directly damaged by the water intrusion. *Id.* at *7. The court ruled that only articles of clothing that were "physically changed in some manner," either by the water intrusion or the resulting mold and mildew spores, were "damaged" to an extent covered under the terms of the policy. *Id.* at *7–8.

The Oregon Supreme Court held in the context of a liability insurance policy that including the word "physical" in the terms of the policy excluded coverage for consequential or intangible damages. *Wy. Sawmills*, 282 Or. at 406. In that case, the plaintiff sought indemnification for damages it caused by selling defective lumber to a customer. *Id.* at 403. The purchaser used the defective lumber as studs in a building, and the studs later warped and twisted. *Id.* The court held that the policy, which defined "property damage" as "physical injury to or destruction of tangible property," did not cover consequential damages such as diminished value but did cover the cost of labor for "tearing out and putting back other parts of the building . . . in order to replace the studs[.]" *Id.* at 404, 408.

The Ninth Circuit also has held that the phrase "direct physical loss" requires damage to a tangible item of property. *Sentience Studio, LLC v. Travelers Ins. Co.*, 102 F. App'x 77, 81 (9th Cir. 2004) (mem.) (holding that a business property insurance policy covering "direct physical loss" did not cover losses stemming from the removal of a producer's name from the film credits because film credits are not tangible property—"'physical' loss cannot occur to the intangible."); *Commonwealth Enters. v. Liberty Mut. Ins. Co.*, 101 F.3d 705, at *2 (9th Cir. 1996) (table) (holding that tenants' fear of asbestos contamination that led tenants to vacate commercial buildings was not physical loss or damage covered under business interruption provision).

The Oregon Court of Appeals has held that methamphetamine odor in a home constituted "accidental direct physical loss" within the meaning of an all-risk homeowner's insurance policy. *Farmers Ins. Co. of Or. v. Trutanich*, 123 Or. App. 6, 9–10 (1993). The court reasoned that the "odor was 'physical' because it damaged the house." *Id.* at 10. The court rejected the insurer's argument that *Wyoming Sawmills* compelled a finding of no coverage by distinguishing the building in *Wyoming Sawmills* from the odor-permeated home and personal items damaged by the methamphetamine odor. *Id.* at 11.

In *Great Northern Insurance Company v. Benjamin Franklin Federal Savings and Loan Association*, a tenant of a commercial building owned by the insured discovered asbestos while remodeling a unit and demanded that the insured remove the asbestos. 793 F. Supp. at 261, *aff'd*, 953 F.2d 1387 (9th Cir. 1992). When the landlord refused and the tenant then vacated the unit, the insured submitted a business interruption claim under its property insurance policy, which covered "direct physical loss or damage." *Id.* The court ruled that coverage did not exist based on the presence of asbestos in the building because "[t]here is no evidence here of *physical* loss, direct or otherwise." *Id.* at 263. Affirming the district court, the Ninth Circuit held:

> We agree with the district court, applying Oregon case law, that [the insured's] loss did not result "from direct physical loss." While [the insured] no doubt sustained consequential loss caused by the necessity of cleaning up asbestos, we conclude that it did not sustain "direct physical loss."

953 F.2d 1387, at *1 (9th Cir. 1992) (mem.).

Plaintiffs' Complaint does not allege a loss that would trigger coverage under any of the relevant provisions of the Policy. Plaintiffs do not allege that their restaurants or the business personal property located inside them was lost, destroyed, or physically changed in any manner. Plaintiffs' Complaint alleges that (1) "The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by the Restaurants, their employees and their

customers;" and (2) "As a result of the Orders, components of the Restaurants became unusable and/or lost the ability to generate income;" (3) "There are numerous individuals who had tested positive for COVID-19, and those numbers continue to grow;" (4) "COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties near the Restaurants;" and (5) "COVID-19 was and is being transmitted in or between properties throughout the areas near the Restaurants, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces." Compl. ¶¶ 62–63.

Plaintiffs also allege that "[t]he presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties, and this direct physical loss and/or direct physical damage prompted the issuance of the Orders." Compl. ¶ 62. Absent from those allegations are any facts from which a factfinder could conclude that (1) the government closure orders dispossessed or damaged any of Plaintiffs' property or (2) that the virus that causes COVID-19 dispossessed Plaintiffs of their property or physically damaged their property. Plaintiffs' conclusory allegations that they suffered direct physical loss and damage are insufficient to state a claim. *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) ("conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal"). The absence of facts demonstrating any physical loss or damage to their business property is fatal to Plaintiffs' claim.

Numerous courts in this circuit and around the country have reached the same conclusion that this Court reaches today. *See, e.g.*, *Protégé Rest. Partners, LLC*, 2021 WL 428653, at *4 (finding "direct physical loss of or physical damage to" unambiguous, that it requires a "distinct, demonstrable, physical alteration of the property" to invoke coverage, and noting that every

California court to address COVID-19 business interruption claims to date has concluded that "government orders that prevent full use of a commercial property or that make the business less profitable do not themselves cause or constitute 'direct physical loss of or physical damage to' the insured property."); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020) (finding that even assuming presence of virus at the plaintiffs' business premises, business income losses were directly caused by precautionary measures taken by the state to prevent the spread of COVID-19 rather than by direct physical loss of or damage to property); *Uncork & Create LLC*, 498 F. Supp. 3d 878, 883 (S.D. W. Va. 2020) (no coverage because "COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant."); *Johnson v. Hartford Fin. Servs. Grp.*, No. 20-cv-02000, ___ F. Supp. ___, 2021 WL 37573, at *7 (N.D. Ga. Jan. 4, 2021) ("COVID-19 hurts people, not property"); *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, No. 2:20-cv-01240-JAD-NJK, 2021 WL 769660, at *3 (D. Nev. Feb. 26, 2021) (ruling that "pure, economic losses caused by COVID-19 closures do not trigger policy coverage predicated on "direct physical loss or damage"); *Levy Ad Grp., Inc. v. Chubb Corp.*, No. 2:20-cv-00763-JAD-DJA, 2021 WL 777210, at *3 (D. Nev. Feb. 16, 2021) (same); *Nguyen v. Travelers Cas. Ins. Co. of Am.*, No. 2:20-cv-00597-BJR, 2021 WL 2184878, at *10–11 (W.D. Wash. May 28, 2021) (granting insurer's dispositive motions in consolidated actions against ten groups of insurers brought by hundreds of Washington businesses and finding that COVID-19 does not cause "direct physical damage to" or "direct physical loss of" property).[2]

---

[2] *See also Newman Myers Kreines Gross Harries, P.C. v. Gr. N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) (finding that the phrase "direct physical loss or damage . . . unambiguously[] requires some form of actual, physical damage to the insured premises to trigger loss of business income and extra expense coverage."); *Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*, 939 F. Supp. 2d 1059, 1069 (D. Haw. 2013) (finding

Construing the allegations in the light most favorable to Plaintiffs, the losses Plaintiffs allege are purely economic and not the result of any "direct physical loss of or damage to property." Plaintiffs' pleadings attempt to characterize the harmful effects of government closure orders issued in response to the public health crisis presented by the pandemic as "physical loss" or "physical damage," but no physical loss of or physical damage to its property occurred. As a result, no coverage exists under the Business Income provision of the Policy.[3]

        i.      The Policy does not cover a "deprivation of functionality" of undamaged dining rooms and related property.

Plaintiffs argue that the phrases "loss of" and "damage to" have different meanings and that Plaintiffs can recover for a loss of undamaged property. Pl. Opp'n 7–8. The Court agrees. *See Total Intermodal Servs. v. Travelers Prop. Cas. Co. of Am.*, No. CV 17-04908AB (KSx), 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018) ("[t]o interpret 'physical loss of' as requiring 'damage to' would render meaningless the 'or damage to' portion of the same clause, thereby violating a black-letter canon on contract interpretation—that every word be given a meaning."). But the Court declines to adopt the definition of "loss" that Plaintiffs urge the Court to apply. Plaintiffs argue that the Court should apply definitions of the word "loss" that are synonymous with "deprivation," "dispossession," and "impairment." Pl. Opp'n 10. But that argument ignores the context in which the words "loss" and "damage" appear in the Policy. "Loss" and "damage" do not appear in isolation. Those words are modified by the word "physical." The modification of those words by the word "physical" means that the insured must demonstrate a deprivation,

---

that "direct physical loss or damage" means "that an event had a direct impact and proximately caused a loss related to the physical matter of the Property").

[3] To the extent that Plaintiffs allege that the Extended Business Income provision covers their losses, *see* Compl. ¶ 59, no coverage exists under that provision because it applies only "[i]f the necessary suspension of your 'operations' produces a Business Income loss payable under this policy." Because no business income loss is payable under the Policy, the Extended Business Income provision does not apply.

dispossession, or impairment that is physical in nature, which requires that the loss is a physical

loss of possession, deprivation, or impairment of the property:

> In order to trigger coverage under a direct physical loss theory, an outside peril must cause an inability to interact with the property because of an alteration to its physical status. COVID-19, and more specifically the Governor's Proclamations, may have limited the uses of the property by preventing certain indoor activities previously conducted on the premises, but they did not cause dispossession of the buildings [or the business personal property located in them].

*Ngyuen*, 2021 WL 2184878, at *10–11. The requirement that "physical loss" requires physical

dispossession or loss of the presence of property for coverage to exist is consistent with the

authority cited by Plaintiffs. For example, Plaintiffs cite *Nautilus Group, Inc. v. Allianz Global

Risks US* for the proposition that a covered "physical loss" can occur in the absence of any

damage. Pl. Opp'n 11. In *Nautilus*, the district court found that the insured had suffered a

covered physical loss when a disgruntled former employee took important business documents

necessary to keep the business open and refused to return them. *Nautilus Grp., Inc. v. Allianz

Global Risks US*, No. C11-5281BHS, 2012 WL 760940, at *2–3, 7 (W.D. Wash. Mar. 8, 2012).

*Nautilus* is distinguishable from the facts of this case. In *Nautilus*, the insured physically lost

possession of the important business documents when the disgruntled former employee took

them and refused to return them. *Id.* at *7. Plaintiffs have not alleged a similar dispossession of

their property.

Plaintiffs also rely on *Total Intermodal*, in which the Central District of California found

that a policy that covered risks of direct physical loss or damage covered the loss of cargo that

the insured's employee improperly labeled and was later destroyed by Chinese authorities. 2018

WL 3829767, at *2–4. Plaintiffs' Complaint alleges no loss of business property similar to that at

issue in *Nautilus Group* and *Total Intermodal* that would trigger coverage under the Policy.

The selective definition of "loss" that Plaintiffs urge the Court to apply would render the word "physical" surplusage and is contrary to longstanding insurance law doctrine which provides that all-risk insurance policies are intended to cover damage to property, not economic loss. *Ngyuen*, 2021 WL 2184878, at *11 (finding that the plaintiffs "conflate *physical* loss with non-physical loss of use.").

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Generally; "Physical" loss or damage*, 10A Couch on Ins. § 148:46 (3d ed. Supp. 2021) (footnotes omitted). As a result, although the word "loss" in isolation has a meaning that could include intangible losses, the Court declines to adopt that definition because "loss" is modified by "physical" in the Policy, which limits the meaning to tangible losses.

The plain meaning of the policy language and the multitude of cases interpreting identical and similar language make clear that "direct physical loss of or damage to property" does not include a loss of use or "impairment of functionality" of undamaged property for its intended purpose. *See, e.g.*, *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1145 (8th Cir. 2021) (holding that policy covering direct "accidental physical loss or accidental physical damage" did not cover oral surgeons' "partial loss of use of its offices . . . due to the COVID-19 pandemic and the related government-imposed restrictions.") (emphasis omitted); *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 298 (S.D. Miss. 2020) ("Plaintiffs' *operations* are not what is insured—the building and the personal property in or on the building are."). Even affording Plaintiffs the most liberal reading of its allegations, their Complaint alleges only that the government orders restricted the manner in which their restaurants may serve customers,

while leaving the property itself in Plaintiffs' possession, unharmed, and undamaged. As a result, Plaintiffs have failed to allege a direct physical loss of or damage to its covered property.

> ii.     Whether property must become completely uninhabitable or be rendered completely useless to invoke coverage

Plaintiffs also contend that a line of cases finding that direct physical loss or damage had occurred after a contaminant rendered the property uninhabitable or useless applies to the facts of this case. Pl. Opp'n 12–13. Plaintiffs rely on cases from other districts and state courts to suggest that "physical loss or damage" occurs when business property becomes useless or only partially inhabitable. *Id.* The Court finds those cases unpersuasive and distinguishable.

Plaintiffs first rely on *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690 (Ct. App. 1996). Pl. Opp'n 12–13. In *Armstrong World Industries*, the court analyzed whether "property damage" had occurred under a third-party liability policy that defined "property damage" as "i) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or ii) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." 52 Cal. Rptr. 2d at 731. That case is distinguishable because Plaintiffs' Policy does not include a definition of "property damage" that includes a loss of use of undamaged property.

Plaintiffs also rely on cases in which courts found that contamination by smoke, lead, and arsenic constituted physical loss or damage. But in each of those cases, the contamination either 1) physically damaged the property requiring repairs or remediation to part or all of the building, or 2) rendered the property completely uninhabitable. *See, e.g.*, *Or. Shakespeare Festival Ass'n*, 2016 WL 3267247, at *5 (finding business interruption coverage applied when poor air quality from wildfire smoke rendered performance of a play unsafe for performers and guests); *Stack*

*Metallurgical Servs, Inc.*, 2007 WL 464715, at *8 (finding that the disintegration of a hammer in a furnace that contaminated it with lead particles constituted "direct physical damage"); *Ass'n of Apartment Owners of Imperial Plaza*, 939 F. Supp. 2d at 1069 (finding that arsenic contamination in a concrete slab requiring remediation and replacement constituted "direct physical loss or damage"). Plaintiffs' argument thus has two flaws. First, Plaintiffs failed to allege any contamination of its restaurant that rendered it physically uninhabitable. Second, Plaintiffs' assertion that those cases demonstrate that any "deprivation of functionality" caused by contamination is covered is an overbroad reading of the rulings in those cases, which apply to contaminations in such quantities that render buildings temporarily completely uninhabitable or which physically damage property in a manner that requires repair. Plaintiffs have alleged no similar facts.

B.     Civil Authority Coverage

For coverage to exist under the Civil Authority provision, Plaintiffs must plausibly allege that an action of civil authority prohibited access to their restaurants due to "direct physical loss of or damage to property, other than at the described premises." Thus, to survive a motion to dismiss, Plaintiffs must plausibly allege that (1) an action of civil authority prohibited access to their restaurants, and (2) the action of civil authority was due to "direct physical loss of or damage to property" somewhere other than Plaintiffs' restaurants. The allegations in Plaintiffs' Complaint fail to meet both requirements.

Plaintiffs allege that the orders prohibited access to their restaurants because (1) the orders prohibited customers from accessing the dining rooms of their restaurants, Compl. ¶ 43; (2) "the Restaurants' employees were prohibited from traveling to or accessing the Restaurants for purposes of serving dine in food," Compl. ¶ 45; and (3) their employees were prohibited from

working in close proximity to each other, including but not limited to "social distancing guidelines and other safety requirements that are not compatible with professional use of a kitchen," Compl. ¶ 47.

On March 16, 2020, the San Francisco Department of Public Health issued Order of the Health Officer No. C19-07, which provided that "[r]estaurants and cafes—regardless of their seating capacity—that serve food are ordered closed except solely for takeout and delivery service."[4] *Id.* ¶ 28; Compl. Ex. 1 at 2, ECF 1-1. That order also permitted travel to work at "Essential Businesses" and travel to perform "Essential Activities" like obtaining food, medicine, and pet supplies. Compl. Ex. 1 at 6. "Essential Businesses" are defined in the order to include "Restaurants and other facilities that prepare and serve food, but only for delivery or carry out." *Id.* at 8. The order required that people engaged in work at Essential Businesses abide by social distancing requirements "at all times as reasonably possible . . . by maintaining six-foot social distancing for both employees and members of the public." *Id.* at 4. The order clarified that "[a]ll Essential Businesses are strongly encouraged to remain open." *Id.*

Each of the orders issued by the San Francisco Department of Public Health—the entity that ordered restaurant services limited to takeout and delivery and thus caused Plaintiffs' losses—indicate that the Order was issued to slow the spread of COVID-19 to avoid overwhelming the healthcare system and to protect the most vulnerable to COVID-19 infection. *Id.* at 5. For example, the March 31, 2020 Order indicates that it was issued "to slow the spread of COVID-19 and mitigate the impact on delivery of critical healthcare services to those in need.

---

[4] The Court considers the orders and proclamations discussed in this section because they are incorporated by reference into Plaintiffs' Complaint and judicially noticeable under Fed. R. Evid. 201. *See McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at * 4–5 (D. Ariz. May 8, 2020) (taking judicial notice of Arizona governor's executive orders issued in response to the COVID-19 pandemic).

All provisions of this Order must be interpreted to effectuate this intent." Compl. Ex. 2 at 5. *See also* Compl. Ex. 1 at 3 (March 16, 2020 Order of the Health Officer issued "to slow the spread of COVID-19 to the maximum extent possible"); Compl. Ex. 5 (Governor's March 19, 2020 Order "issued to protect the public health of Californians").

On April 10, 2020, the mayor of San Francisco issued a "Ninth Supplement to Mayoral Proclamation Declaring the Existence of A Local Emergency." The Proclamation placed limits on the fees that third-party delivery companies can charge San Francisco restaurants and provided that "this order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time." Compl. ¶ 40; Compl. Ex. 3 at 3, ECF 1-3. There is no indication in Mayor Breed's Ninth Supplement that her reference to "the previous orders issued during this emergency" referred to the orders of the Health Officer rather than her own.

Contrary to Plaintiffs' contentions, none of the orders prohibited access to specific portions of restaurants or restaurant property. Although Plaintiffs suggest that the orders restricted the access to their restaurants by employees because of social distancing guidelines, the orders require social distancing when "reasonably possible" or "to the greatest extent feasible" and were otherwise encouraged to remain open. Comp. Ex. 1 at 4, 6. Thus, the orders did not "prohibit" Plaintiffs' employees from accessing Plaintiffs' restaurants. Instead, the orders prohibited restaurants from providing dine-in service.

In addition, Plaintiffs failed to plausibly allege that the orders were issued "due to direct physical loss of or damage to property, other than at the described premises." Although San Francisco Mayor Breed proclaimed in her Ninth Supplement that the April 10, 2020 order and

"the previous orders issued during this emergency have all been issued because . . . the virus physically is causing property loss or damage", that statement belies the purposes reflected in the San Francisco Department of Public Health Orders of the Health Officer. Each of the Health Officer's orders incorporated by reference into Plaintiffs' Complaint ordered restaurants to serve food only for take-out or delivery in order to slow the spread of COVID-19. There is no allegation that the Health Officer's orders had any other purpose or that San Francisco's mayor referred to the Health Officer's previous orders rather than her own when she proclaimed that the previous orders were issued due to property loss or damage. Thus, Plaintiffs failed to establish that the relevant orders—those of the Health Officer—were issued "due to direct physical loss of or damage to property, other than at the described premises." As a result, Plaintiffs have failed to plausibly allege that coverage exists under the Civil Authority provision of the Policy.

## IV.     Context within the Policy as a Whole

When the terms of an insurance policy have plain meaning, then the Court applies the plain meaning without need to resort to other methods of contract interpretation. *Holloway*, 341 Or. at 650. However, it is worth emphasizing that the context in which the phrases "direct physical loss," "direct physical loss of or damage to property," and "direct physical loss or damage to property" appear in the Policy confirms the accuracy of the Court's conclusion that the Policy requires a direct physical alteration of the condition of the property or dispossession of the property for coverage to apply.

The Policy covers Plaintiffs' business liability and provides property coverage. Policy 9. Section I of the Policy, which covers "PROPERTY", explains that "Covered Property" includes items of tangible property including "Buildings," which are defined as "the buildings and structures at the premises" and their fixtures, additions, and permanently installed machinery;

and "Business Personal Property." *Id*. All items described in the definition of "Covered Property" are tangible items. The "Property Not Covered" also includes a list of tangible items. *Id*. at 9–10. Nothing in the Policy suggests that Covered Property includes intangible things like profitability, business operations, and loss of use or function. When read in the context of the Policy as a whole, the phrases "direct physical loss," "direct physical loss of or damage to," and "direct physical loss or damage to" refer to the loss of or damage to the Covered Property—the building, its fixtures, and the personal property in it—and the loss of business income resulting from the insured's inability to continue its business operations as a direct result of having lost or damaged that tangible property.

The definition of "period of restoration" also supports the Court's interpretation that loss of or damage to tangible property must occur to invoke coverage under the Policy. The Business Income provision covers certain financial losses incurred "during the 'period of restoration.'" Policy 13. The "period of restoration" starts seventy-two hours after the "physical loss or damage" occurs and ends on "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality" or when the insured's "business is resumed at a new permanent location." *Id*. at 30–31. That definition of "period of restoration" implies that Plaintiffs must lose or suffer physical damage to its tangible property which requires repair or replacement to invoke coverage.

The "Loss Payment" section of the Policy which governs how Defendant will pay for damage to Covered Property also demonstrates that property must be physically lost or damaged to invoke coverage. That provision allows the insurer to decide whether it will

(1) Pay the value of lost or damaged property;
(2) Pay the cost of repairing or replacing the lost or damaged property;
(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and
quality[.]

*Id*. at 24. The option of the insurer to decide whether to repair, replace, or take and pay the

insured the value of damaged property also suggests that to invoke coverage (1) the loss or

damage of the property must be tangible; and (2) the property must have had an initial

satisfactory state that changed to an unsatisfactory state when an external force acted on the

property. The "Loss Payment" provision is entirely inconsistent with the Policy covering an

inability to use undamaged restaurant dining rooms and related business personal property. An

inability to use property in the manner the insured intended is not something that can be repaired,

rebuilt, or replaced.

## V.    Ordinance or Law Exclusion

Defendant argues that even if Plaintiffs had stated a plausible claim for coverage, the

Ordinance or Law exclusion excludes Plaintiffs' claims. Def. Mot. 28–29. That provision

excludes from coverage "loss or damage . . . caused directly or indirectly by . . . [t]he

enforcement of any ordinance or law . . . [r]egulating the construction, use or repair of any

property." Policy 19. Because Plaintiffs have not demonstrated that coverage exists, the Court

need not determine whether any exclusion applies. *See ZRZ Realty Co.*, 222 Or. App. at 465.

## VI.    Plaintiffs' Remaining Claims

Defendant argues that the Court should dismiss Plaintiffs' claims for breach of the

implied covenant of good faith and fair dealing and for violation of California's Unfair

Competition Law because both of those claims are based on Plaintiffs' allegation that Defendant

breached the insurance contract by failing or refusing to pay for covered losses. Def. Mot. 29.

Plaintiffs did not respond to this argument.

The Court agrees that dismissal of Plaintiffs' breach of the implied covenant of good faith and fair dealing and unfair business practices claims is appropriate.

A.    Duty of Good Faith and Fair Dealing

Plaintiffs' Complaint alleges that Defendant breached the implied covenant of good faith and fair dealing claim by

> (a) unreasonably and in bad faith denying Plaintiffs and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiffs' and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of its insurance policies for the purpose of denying coverage.

Compl. ¶ 112. Under Oregon law, Plaintiffs can pursue a claim for breach of the duty of good faith and fair dealing that is independent from Plaintiffs' claim for breach of the express terms of the Policy. *See Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010). The duty of good faith and fair dealing "serves to effectuate the objectively reasonable expectations of the parties," *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615 (1995), and bars "improper behavior in the performance and enforcement of contracts . . . to ensure that the parties 'will refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" *Klamath Off-Project Water Users*, 237 Or. App. at 445 (quoting *Iron Horse Eng'g v. Nw. Rubber*, 193 Or. App. 402, 421 (2004)). However, the duty of good faith and fair dealing "'cannot contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract.'" *Id.* (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)). Because the duty of good faith and fair dealing cannot contradict an express contractual term, it "'may be implied as to a disputed issue *only* if the parties have not agreed to an express term that governs that issue.'"

*Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys. v.*

*Or. Pub. Emp. Union*, 185 Or. App. 506, 511 (2002)) (emphasis in *Arnett*).

Each of the breaches identified by Plaintiffs seeks a remedy for an act that Defendant was

permitted to do under the express terms of the contract—that is, deny Plaintiffs' insurance claim.

The first basis for Plaintiffs' breach of the covenant of good faith and fair dealing claim simply

alleges that Defendant breached the contract. Compl. ¶ 112(a). The second breach identified by

Plaintiffs—failure to investigate—did not have the effect of destroying or injuring Plaintiffs'

rights under the contract because no coverage existed. Compl. ¶ 112(b). Third, Plaintiffs'

allegation that Defendant asserted legally and factually invalid defenses to coverage that delayed

the resolution of Plaintiffs' claims, Compl. ¶ 112(c), also fails to allege any conduct that

jeopardized Plaintiffs' rights under the Policy because Defendant correctly determined that the

Policy did not cover Plaintiffs' pandemic-related financial losses. Finally, the fourth breach

identified by Plaintiffs—that Defendant improperly applied unduly restrictive interpretations of

the terms of the Policy—is another way of saying that Defendant breached the contract by

denying coverage. Compl. ¶ 112(d). Plaintiffs had no objectively reasonable expectation of

coverage under the express terms of the Policy. If Defendant had extended coverage for

Plaintiffs' claims, it would have contradicted the express terms of the contract. Accordingly,

Plaintiffs failed to state a plausible claim for breach of the duty of good faith and fair dealing.

Plaintiffs also allege that Defendant "has acted with malice, shown a reckless and

outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious

indifference to Plaintiffs' and the Class members' rights and welfare, thereby entitling Plaintiffs

and the Class members to punitive and exemplary damages against the Defendant." *Id.* ¶ 113.

Punitive damages are not recoverable in an action for an insurer's breach of an insurance

contract. *See Farris v. U.S. Fidelity & Guar. Co.*, 284 Or. 453, 466 (1978). Thus, to the extent that Plaintiffs seek punitive or exemplary damages in connection with their breach of the duty of good faith and fair dealing claim, that claim also fails to plausibly allege a claim for relief.

      B.     California Unfair Competition Law Claim

Plaintiffs' unfair business practices claim under California's Unfair Competition Law is based on Plaintiffs' allegation that Defendant failed to investigate Plaintiffs' insurance claim and instead categorically denied their claims. Compl. ¶ 118. Plaintiffs also allege that Defendant violated the California Insurance Code. Under California law, unfair competition means "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200. The California Insurance Code prohibits certain acts, including but not limited to misrepresentations concerning the terms of any policy issued or to be issued. Cal. Ins. Code § 790.03(a). The California Insurance Code also includes provisions requiring the prompt investigation and acceptance or denial of claims. Cal. Ins. Code. § 790.03(h)(4). The allegations in Plaintiffs' Complaint buttressing their unfair business practices claim are based on "Defendant's conduct alleged herein" and mirror the bases of their claim for breach of the covenant of good faith and fair dealing. Compl. ¶¶ 117–123. They also allege that Defendant denied their claim without first conducting a proper investigation. *Id.* ¶ 119.

Because the Court finds that the conduct Plaintiffs allege in the Complaint did not constitute a breach of contract, Plaintiffs failed to state a claim for violation of California's Unfair Competition Law. Plaintiffs also allege that Defendant failed to properly investigate their insurance claim. However, a more thorough investigation into Plaintiffs' insurance claims, if required, would have yielded no different result than the Court reaches today. Plaintiffs have

identified no provision of the California Insurance Code that Defendant violated by promptly

denying their insurance claim, and the Court has identified none.

Because Plaintiffs have identified no other basis for their unfair business practices claim

and did not oppose Defendant's motion to dismiss their unfair business practices and breach of

the covenant of good faith and fair dealing claims, the Court dismisses those claims.

## VII.    Leave to Amend

Because the Court finds that Plaintiffs' Complaint cannot be amended to plausibly allege

a claim under the terms of the Policy, the Court denies leave to amend. *Wheeler v. City of Santa

Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Leave to amend may be denied if amendment

would be futile[.]").

**CONCLUSION**

The Court GRANTS Defendant's Motion to Dismiss [24]. Plaintiffs' Complaint is

dismissed with prejudice.

IT IS SO ORDERED.


DATED:   September 6, 2021       .



MARCO A. HERNÁNDEZ
United States District Judge